UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
UNITED STATES SECURITIES AND      :
EXCHANGE COMMISSION,              :
                                  :
                Plaintiff,        :
                                  :   00 Civ. 8557 (MBM)
       -against-                  :
                                  :    OPINION & ORDER
RICHARD A. SVOBODA and            :
MICHAEL A. ROBLES,                :
                                  :
                Defendants.       :
----------------------------------X

APPEARANCES:

ERICA Y. WILLIAMS, ESQ.
DANIEL H. RUBENSTEIN, ESQ.
(Attorneys for plaintiff)
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549
(202) 551-4450

ROGER J. SCHWARZ, ESQ.
(Attorney for defendant Richard A. Svoboda)
555 Fifth Avenue, 14th Floor
New York, NY 10017
(212) 818-0909

CHARLES D. ABERCROMBIE, ESQ.
(Attorney for defendant Michael A. Robles)
444 Madison Avenue
New York, NY 10022
(212) 371-4500

MICHAEL B. MUKASEY, U.S.D.J.

The Securities and Exchange Commission ("SEC") moves for summary judgment under Fed. R. Civ. P. 56(a) against defendants Richard A. Svoboda and Michael A. Robles on claims brought under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) (2000), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5 (2005); Section 14(e) of the Exchange Act, 15 U.S.C. § 78n(e), and Rule 14e-3 thereunder, 17 C.F.R. § 240.14e-3 (2005); and Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a).  In addition, the SEC seeks permanent injunctive relief barring Svoboda and Robles from violating the securities laws; disgorgement and prejudgment interest; the imposition of joint and several liability on Svoboda for Robles' disgorgement and prejudgment interest; and the maximum civil penalties permitted by Section 21A of the Insider Trading and Securities Fraud Enforcement Act, 15 U.S.C. § 78u-1.  Defendants, both convicted of criminal charges that underlie these claims, do not contest their civil liability, but challenge the relief requested.  For the reasons set forth below, summary judgment on all of the SEC's claims is granted, as is permanent injunctive relief against both defendants.  In addition, this court imposes disgorgement, prejudgment interest, and joint and several liability on Svoboda for Robles' disgorgement and prejudgment interest.  Finally, the

1

court imposes civil penalties of $150,000 on Svoboda and $250,000 on Robles, amounts less than requested by the SEC.

## I.

Between 1994 and 1998, Svoboda, a credit policy officer in the Dallas office of NationsBank N.A. ("NationsBank"), evaluated and approved NationsBank's extension of credit to clients, as well as various other credit arrangements. (SEC's Rule 56.1 Statement of Material Facts ("Pl.'s Statement of Facts") ¶ 2, 11)[1] These responsibilities gave him access to nonpublic information about the clients' earnings, expected performance, possible or actual merger and acquisition plans, restructurings, and tender offers, as contained in memoranda, e-mails, and confidential credit applications. (Id. ¶¶ 2, 10)

---

[1] Consistent with Local Rule 56.1 of the United States District Courts for the Southern and Eastern Districts of New York, the SEC has submitted a "Statement of Material Facts as to Which There Is No Genuine Issue to Be Tried" totaling 183 paragraphs and 40 pages. Local Rule 56.1 requires that defendants furnish in their papers "a correspondingly numbered paragraph responding to each numbered paragraph [in the SEC's statement]." Local Rule 56.1(b) (emphasis omitted). Neither defendant has done so. Instead, each has submitted, through counsel, a Rule 56.1 statement of less than two pages that generally fails to respond to any of the specific facts alleged by the SEC. All of the facts defendants fail to controvert in numbered paragraphs "will be deemed to be admitted" for purposes of the SEC's motion pursuant to Local Rule 56.1(c). See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003); see also S.E.C. v. Musella, 678 F. Supp. 1060, 1061 (S.D.N.Y. 1988); S.E.C. v. Roor, No. 99 Civ. 3372 (HB), 2004 WL 1933578, at *2 n.5 (S.D.N.Y. Aug. 30, 2004).

Svoboda also worked closely with NationsBank client relationship managers and credit products officers who often informed him of developments that might affect the credit agreements their clients maintained with the company. (Id. ¶ 11)

Svoboda knew throughout his tenure at NationsBank that he was not permitted to use confidential information he obtained through his employment to trade securities or to disclose such information to persons outside the company so that they could trade securities. (Pl.'s Statement of Facts ¶ 6; Rubenstein Decl., Ex. F, 604:8-605:14, 609:12-15) What was no doubt already clear was made explicit around June 1995 when Svoboda received NationsBank's written "General Policy on Insider Trading," which stated, among other things, that "[n]o . . . associate of NationsBank may trade in any security, either personally, or for or on the behalf of others . . . while in possession of Inside Information relating to such security, or communicate or disclose, in any manner, Inside Information to others in violation of a duty to keep it confidential." (Rubenstein Decl., Ex. A, ¶ 4) The policy also provided that "[u]nlawfully disclosing or 'tipping' information about a company to others who then trade while in possession of the information may give rise to claims against the person tipping the information." (Id.) In about April 1997, Svoboda received a revised company policy on confidential information that stated: "All material nonpublic

3

information . . . obtained by an associate during the course of employment . . . must remain confidential and should be used only for the business purpose it was communicated." (Pl.'s Statement of Facts ¶ 5). The revised policy came at a time of "much more rigid rules about trading securities and higher level[s] of supervision and monitoring internally about trading securities." (Rubenstein Decl., Ex. F, 608:20-609:1)

Despite Svoboda's awareness of these policies, in late 1994 or early 1995, he devised a scheme with Robles, a life-long friend who worked as an independent accountant, to use NationsBank's confidential information to trade for profit. (Pl.'s Statement of Facts ¶¶ 3, 13) The two men agreed that Svoboda would furnish Robles with inside information regarding NationsBank clients and advise him regarding the number of shares he could safely buy and yet evade detection. (Id. ¶ 13; Rubenstein Decl., Ex. F, 621:25-622:14, 624:14-25). Robles then would execute all of the trades and split the profits evenly with Svoboda. (Pl.'s Statement of Facts ¶¶ 13, 16) Robles maintained a ledger listing the profits and each defendant's share. (Rubenstein Decl., Ex. F, 710:1-712:13) Pursuant to their scheme, Robles traded in the securities of over 20 different issuers based on inside information between January 1995 and December 1998. (See Pl.'s Statement of Facts ¶¶ 15, 20-172) Svoboda also secretly executed several trades for his own profit

through brokerage accounts held by himself and his wife, despite defendants' agreement that Robles would do all the trading.  (Id. ¶ 17; Rubenstein Decl., Ex. F, 627:7-19, 713:5-20)

The inside information Svoboda provided to Robles most often related to companies that Svoboda knew were involved in prospective acquisitions.  In such a case, Svoboda would tell Robles the proposed acquisition price, the name of the company whose securities Robles would purchase, Svoboda's assessment of the likelihood of the acquisition, and some background information.  (Pl.'s Statement of Facts ¶ 14) Using this method, defendants traded for profit in the securities of fifteen different issuers.  (See id. ¶¶ 20-26, 27-33, 34-40, 47-53, 64-70, 71-78, 79-87, 88-94, 95-99, 100-04, 112-17, 118-23, 124-29, 130-35, 143-60)  Svoboda also provided Robles with inside information regarding a management-led leveraged buyout that both men used to turn a profit.  (Id. ¶¶ 41-46)

Svoboda would also tip Robles regarding nonpublic negative earnings developments relating to companies that were NationsBank clients.  These tips allowed Robles to trade profitably in the securities of four different issuers. (Rubenstein Decl., Ex. F, 623:17-23; see Pl.'s Statement of Facts ¶¶ 59-63, 105-11, 136-42, 161-72)  Svoboda also used nonpublic information regarding favorable earnings at another issuer to net over $8,000 in profits.  (Pl.'s Statement of Facts ¶¶ 54-58)

Svoboda and Robles took steps during the course of their scheme to conceal their activity. For example, in an attempt to avoid a "money trail," Svoboda and Robles agreed that Robles would furnish Svoboda with his share of the trading proceeds in small cash payments. (Rubenstein Decl., Ex. F, 701:2-702:20) To further avoid detection, Svoboda would not deposit these payments in his own bank account nor would he report them on his tax returns. (Id. at 702:21-703:12) Because this method could not keep pace with the "hundreds of thousands of dollars" that Robles owed Svoboda from the trades (id. at 713:4), Svoboda arranged for Robles to make numerous credit card purchases on his behalf, including payments for furniture and a trip to Hawaii. (Id. at 703:18-706:25) In another attempt to conceal their wrongdoing, Svoboda, at Robles' request, provided Robles with public background information on the companies in which he was trading so he could "appear knowledgeable" if asked about a particular trade without revealing that he possessed inside information. (Id. at 628:13-25) In addition, when NationsBank became suspicious of Svoboda's activities after the SEC subpoenaed him, Svoboda lied to company lawyers about his trading to avoid termination and arrest. (Williams Reply Decl., Ex. A, 733:1-734:8) He was ultimately fired for his failure to cooperate in the company's internal investigation. (Id. at 734:9-15)

On November 7, 2000, a grand jury in the Southern District of New York returned a 20-count indictment against both Svoboda and Robles for criminal conspiracy to commit securities fraud in violation of 18 U.S.C. § 371; securities fraud in violation of 15 U.S.C. §§ 78j(b), 78ff, and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; and tender offer fraud in violation of 15 U.S.C. §§ 78n(e), 78ff, and Rule 14e-3 thereunder, 17 C.F.R. § 240.14e-3. (See generally Rubenstein Decl., Ex. A) The same day, the SEC filed a civil complaint in the present action alleging substantially similar, but not identical, insider trading violations.

On February 27, 2002, Svoboda pleaded guilty to the criminal conspiracy charge, and to ten counts of securities fraud and seven counts of tender offer fraud. (See Rubenstein Decl., Ex. C, 4:4-18) In November, Judge Berman sentenced Svoboda to a year and a day of incarceration and ordered him to pay a $200,000 criminal fine. However, Judge Berman noted that he was "not going to impose restitution in light of the [SEC's] civil action that is simultaneously pending." (Rubenstein Decl, Ex. G, 18:6-8) The judgment of criminal conviction was entered on December 4. (See Rubenstein Decl., Ex. E)

On November 11, 2004, after his release from prison, Svoboda filed a Chapter 13 bankruptcy petition in the Northern District of Texas. (Schrage Reply Decl. ¶¶ 1, 2; see also id.,

Ex. C)  The SEC has moved to dismiss Svoboda's bankruptcy action,

arguing that Svoboda is ineligible for Chapter 13 protection

because the unsecured, liquidated, noncontingent claims against

him -- including the SEC's civil claim in this action -- exceed

the statutory limit of $307,675.[2]  (Id. ¶ 2; see also id., Ex. C,

¶¶ 1, 2).  The SEC contends that Svoboda has intentionally under-

reported the SEC's civil claim by "millions of dollars" and has

brought the Chapter 13 proceedings "in bad faith to avoid

repaying his ill-gotten gains."  (Schrage Reply Decl. ¶ 2)

On March 13, 2002, the government filed a superseding

22-count indictment against Robles, charging him with criminal

conspiracy, securities fraud, and tender offer fraud. (See

generally Rubenstein Decl., Ex. D)  Robles went to trial.  At

trial, Svoboda appeared as a government witness and provided

testimony that Judge Berman later characterized as "substantial"

and "very helpful and instrumental in . . . bringing about

[Robles'] conviction." (Rubenstein Decl., Ex. G, 14:6-7, 32:13).

A jury found Robles guilty of the criminal conspiracy charge, and

also convicted him of nine counts of securities fraud and four

counts of tender offer fraud.  (See Rubenstein Decl., Ex. H)  On

February 14, 2003, Judge Berman sentenced Robles to 41 months of

---

[2]      The bankruptcy code provides that "[o]nly an individual
with regular income that owes, on the date of the filing of the
petition, noncontingent, liquidated, unsecured debts of less than
$307,675 . . . may be a debtor under chapter 13 of this title."
11 U.S.C. § 109(e).

incarceration and ordered him to pay a $300,000 criminal fine.
The judge said that he would "not impose restitution," however,
and would "leave it to [the pending SEC action] to determine
whether there are any other financial penalties that might be
appropriate." (Rubenstein Decl., Ex. I, 72:6, 74:5-13)  He also
noted at sentencing that he found Robles' trial testimony to be
"not credible" (id. at 63:4-5) and cited examples of what he
believed to be "intentionally false testimony."  (See id. at
63:1-64:25)  The Court entered a judgment of criminal conviction
on February 18 (Rubenstein Decl., Ex. H), and the Second Circuit
affirmed the conviction on October 24.  See United States v.
Svoboda, 347 F.3d 471 (2d Cir. 2003), cert denied 541 U.S. 1044
(2004).  Robles remains incarcerated.

On March 22, 2005, with this court's permission, the
SEC filed an amended complaint against Svoboda and Robles that
more closely tracked defendants' criminal convictions.  The SEC
has calculated Svoboda's gains from his personal trading to be
$219,100 based on his brokerage account statements.  (Rubenstein
Decl. ¶ 13)  Robles' gains based on a similar analysis total
$1,039,252.80.  (Id. ¶ 15) The SEC has also calculated each
defendant's prejudgment interest on these gains using the
Internal Revenue Service's (IRS) underpayment rate, arriving at
totals of $186,911.11 for Svoboda and $757,821.53 for Robles.
(See id. ¶¶ 16, 17; see also Rubenstein Decl., Exs. L, M)  Robles

contests these calculations for various reasons (see Abercrombie
Decl. ¶ 8; Robles' Statement of Material Issues of Fact Pursuant
to Local Rule 56.1(b) ("Robles' Statement of Facts") ¶ 1);
Svoboda does not, but contends that he has been "sufficiently
punished." (Svoboda Opp. Mem. at 2)


                              II.

        As discussed below, summary judgment is appropriate on
all of the SEC's securities and tender offer fraud claims because
the parties' submissions demonstrate that there is no genuine
issue as to any material fact relating to these claims and that
the SEC is entitled to judgment as a matter of law.  See Fed. R.
Civ. P. 56(c).  The court's analysis is simplified because the
SEC's civil complaint concerns the same conduct as the
indictments that resulted in both defendants' criminal
convictions.  Defendants are collaterally estopped to challenge
the material facts underlying their convictions, as well as their
liability for claims that mirror the criminal counts for which
they were convicted.[3]  See United States v. Podell, 572 F.2d 31,
35 (2d Cir. 1978); Gelb v. Royal Globe Ins. Co., 798 F.2d 38, 43
(2d Cir. 1986) (holding that defendant was "barred from

───────────────

        [3]    In addition, defendants have admitted all of the
material facts set forth in the SEC's Local Rule 56.1 Statement
due to their failure to comply with Local Rule 56.1(b).  See
supra n.1.

relitigating any issue determined adversely to him in the criminal proceeding, provided that he had a full and fair opportunity to litigate the issue"); S.E.C. v. Freeman, 290 F. Supp. 2d 401, 405-06 (S.D.N.Y. 2003) (granting summary judgment for SEC based on prior criminal conviction; defendant estopped to challenge facts established by conviction). Both Svoboda, who pleaded guilty and therefore accepted the truth of the charges against him, and Robles, who was convicted by a jury after a full trial, had a "full and fair opportunity" to litigate issues in their criminal proceedings.

A. Defendants Violated Section 10(b) and Rule 10b-5

The facts established by Svoboda and Robles' criminal convictions establish all of the elements necessary to support civil liability under Section 10(b) of the Exchange Act and Rule 10b-5, which generally prohibit fraud in connection with the purchase or sale of securities. See 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. A person commits fraud under Section 10(b) and Rule 10b-5 when "he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information." United States v. O'Hagan, 521 U.S. 642, 652 (1997). Such conduct violates Section 10(b) because "a fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty

of loyalty and confidentiality, defrauds the principal of the exclusive use of that information."  Id.  If a person who misappropriates confidential information then "tips" another individual, the "tippee" also is liable under Section 10(b) and Rule 10b-5 for trading on the information if the tipper's breach of his duty to the principal has been established and the tippee is aware of the tipper's breach.  United States v. Falcone, 257 F.3d 226, 234 (2d Cir. 2001); see also United States v. Libera, 989 F.2d 596, 600 (2d Cir. 1993).

Whether the defendant is a tipper or a tippee, the plaintiff must demonstrate that the defendant acted with scienter -- i.e., an "intent to deceive, manipulate, or defraud . . . or at least knowing misconduct."  S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996) (internal citations omitted). The plaintiff must show also that the information at issue was "material" and nonpublic.  Information is "material" when there is a "substantial likelihood that a reasonable investor would view it as significantly altering the 'total mix' of information available."  United States v. Cusimano, 123 F.3d 83, 88 (2d Cir. 1997).  Information is nonpublic if it has neither "achieve[d] a broad dissemination to the investing public generally and without favoring any special person or group" nor been traded on by a few persons with knowledge, causing "'the information to be fully impounded into the price of the particular stock.'" United States

v. <u>Mayhew</u>, 121 F.3d 44, 50 (2d Cir. 1997) (citations omitted).

The undisputed facts set forth by the SEC demonstrate that Svoboda breached fiduciary duties owed to NationsBank and its clients by passing along confidential information concerning over 20 different issuers to Robles for trading purposes and by personally trading on such information despite his knowledge that doing so violated NationsBank's insider trading policies, including a duty to keep all inside information confidential and to use such information "only for the business purpose it was communicated." (<u>See</u> Pl.'s Statement of Facts ¶¶ 5, 20-172; Rubenstein Decl., Ex. A, ¶ 4; Rubenstein Decl., Ex. F, 604:8-605:14, 609:12-15) By trading on such information for personal gain and without disclosure to NationsBank or its clients, he deprived the company and its clients of their exclusive use of the information in violation of Section 10(b) and Rule 10b-5. <u>See</u> <u>O'Hagan</u>, 521 U.S. at 652. Robles is liable as a "tippee" because the SEC has established Svoboda's fiduciary duty breaches and Robles' awareness of these breaches. This awareness is demonstrated, among other things, by Robles' agreement to execute all of the trades out of concern that Svoboda could not safely trade given his employment with NationsBank. (Pl.'s Statement of Facts ¶ 13)

The undisputed facts establish also that defendants acted with a high degree of scienter. The scheme involved

repeated acts of fraud over almost four years and numerous steps by both defendants to conceal their illegal activity.

Finally, the information utilized by Svoboda and Robles was material and nonpublic. Most of the inside information Svoboda misappropriated concerned impending tender offers and other acquisitions -- information that is "quintessentially material." S.E.C. v. Gonzalez de Castilla, 145 F. Supp. 2d 402, 412 (S.D.N.Y. 2001); accord S.E.C. v. Warde, 151 F.3d 42, 47 (2d Cir. 1998); Cusimano, 123 F.3d at 88. None of this information had been made public when defendants' executed their trades.

For all of these reasons, summary judgment in the SEC's favor is granted on the SEC's Section 10(b) and Rule 10b-5 claims.

B. Defendants Violated Section 14(e) and Rule 14e-3

Svoboda and Robles' criminal convictions also establish all of the facts necessary to support liability under Section 14(e) of the Exchange Act and Rule 14e-3, which proscribe fraud in connection with a tender offer. See 15 U.S.C. § 78n(e); 17 C.F.R. § 240.14e-3(a). A defendant violates Rule 14e-3(a) "if he trades on the basis of material nonpublic information concerning a pending tender offer that he knows or has reasons to know has been acquired 'directly or indirectly' from an insider of the offeror or issuer, or someone working on their behalf."

14

O'Hagan, 521 U.S. at 669 (quoting United States v. Chestman, 947 F.3d 551, 557 (2d Cir. 1991)).  Under Section 14(e), unlike Section 10(b) and Rule 10b-5, no breach of fiduciary duty is required to establish liability.  See O'Hagan, 521 U.S. at 676; Chestman, 947 F.2d at 557.  Liability only attaches when a person or entity "has taken a substantial step or steps" to commence a tender offer.  17 C.F.R. § 240.14e-3(a); Mayhew, 121 F.3d at 53.

The undisputed facts demonstrate that Svoboda and Robles repeatedly violated Section 14(e) and Rule 14e-3 by trading based on confidential inside information about impending tender offers that Svoboda acquired from NationsBank with knowledge that such information came from NationsBank clients. (See, e.g., Pl.'s Statement of Facts ¶¶ 47-53, 95-99) In each case, the offeror had already taken a "substantial step" toward executing the tender offer, such as contacting NationsBank to arrange financing, and in each case, Svoboda and Robles acquired shares shortly before news of the tender offer became public. These facts, coupled with Svoboda and Robles' criminal convictions for multiple counts of tender offer fraud, overwhelmingly support summary judgment against them for violations of Section 14(e) and Rule 14e-3.

C. Defendants Violated Section 17(a)

Finally, although Svoboda and Robles were not charged

with criminal violations of Section 17(a) of the Securities Act, the facts underlying their Section 10(b) convictions establish civil liability under Section 17(a).  That section prohibits the use of "any device, scheme, or artifice to defraud" in the "offer or sale of any securities."  15 U.S.C. § 77q(a).  The Second Circuit has explained that "essentially the same elements" are required to prove fraud under Section 17(a) as are required under Section 10(b), "though no showing of scienter is required for the SEC to obtain an injunction under subsections (a)(2) or (a)(3) [of Section 17]."  S.E.C. v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999); see also First Jersey, 101 F.3d at 1467.  For this reason, district courts repeatedly have given estoppel effect to the facts established by a Section 10(b) conviction in a subsequent SEC enforcement action brought under Section 17(a) and vice versa.  See S.E.C. v. McCaskey, No. 98 Civ. 6153 (SWK), 2001 WL 1029053, at *4-*5 (S.D.N.Y. Sept. 6, 2001); S.E.C. v. Namer, No. 97 Civ. 2085 (PKC), 2004 WL 2199471, at *5 (S.D.N.Y. Sept. 30, 2004); S.E.C. v. Roor, No. 99 Civ. 3372 (HB), 2004 WL 1933578, at *7 (S.D.N.Y. Aug. 30, 2004).

    The facts underlying defendants' convictions satisfy all elements necessary to establish liability under Section 10(b) and Rule 10b-5.  Because the elements under Section 10(b) and Section 17(a) are "essentially the same" and because defendants' fraudulent scheme involved the "offer or sale of securities" of

over 20 issuers, the SEC is entitled to summary judgment on its

Section 17(a) claims.


III.

Having granted summary judgment on all of the SEC's

securities and tender offer fraud claims, I must turn now to the

SEC's request for various forms of equitable and monetary relief.

As explained below, the SEC is entitled to most, but not all, of

the relief it seeks.


A. Permanent Injunction

Both the Securities Act and the Exchange Act authorize

permanent injunctive relief where, as here, it "appear[s] to the

[SEC] that any person is engaged or about to engage" in acts that

constitute or will constitute securities law violations.  See 15

U.S.C. §§ 77t(b), 78u(d)(1).  "An injunction prohibiting a party

from violating statutory provisions is appropriate where there is

a likelihood that, unless enjoined, the violations will

continue."  First Jersey, 101 F.3d at 1477 (internal quotation

marks omitted).  "Such an injunction is particularly within the

court's discretion where a violation was founded on systematic

wrongdoing, rather than an isolated occurrence, and where the

court views the defendant's degree of culpability and continued

protestations of innocence as indications that injunctive relief

is warranted." Id. (internal citations and quotation marks omitted). Courts also generally look at a defendant's ability to commit future violations. See, e.g., Freeman, 290 F. Supp. 2d at 406; S.E.C. v. Credit Bancorp, Ltd., 195 F. Supp. 2d 475, 495 (S.D.N.Y. 2002).

Applying these factors, courts in this district have granted permanent injunctive relief on an SEC motion for summary judgment where the fraud scheme at issue was broad in scope, long in duration, and involved a high degree of scienter. See Freeman, 290 F. Supp. 2d at 405, 406 (granting permanent injunction where defendant used inside information to trade securities on eight occasions over two years); McCaskey, 2001 WL 1029053, at *5 (granting permanent injunction where defendant's stock manipulation scheme utilized 22 different accounts and lasted seven months); S.E.C. v. Sekhri, No. 98 Civ. 2320 (RPP), 2002 WL 31100823, at *15 (S.D.N.Y. July 22, 2002) (granting permanent injunction where defendants' misappropriation scheme utilized confidential information on five major corporate transactions and lasted more than a year); S.E.C. v. Milan Capital Group, Inc., No. 00 Civ. 108 (DLC), 2000 WL 1682761, at *9 (S.D.N.Y. Nov. 9, 2000) (granting permanent injunction where defendants' IPO fraud scheme involved approximately 200 investors and lasted "several months").

The same result should obtain here. Svoboda and

Robles' scheme involved over 20 issuers, lasted almost four years, and employed numerous measures to evade detection. As such, it involved at least as much, if not more "systematic wrongdoing" and highly culpable conduct than the conduct that was found to warrant permanent injunctive relief in Freeman, McCaskey, Sekhri, and Milan Capital.

Moreover, although neither defendant still maintains his innocence, each has engaged in behavior that calls into question both his acceptance of responsibility and his pledge to abstain from violating the securities laws. Svoboda initially lied to NationsBank lawyers after the SEC had commenced its investigation into his activities and has recently brought a Chapter 13 bankruptcy action that the SEC contends was filed in "bad faith" to avoid his civil liability. (See Williams Reply Decl., Ex. A; Schrage Reply Decl. ¶ 2) Robles maintained his innocence throughout his criminal trial and gave testimony that Judge Berman characterized at sentencing as "not credible" and, at times, "intentionally false." (Rubenstein Decl., Ex. I, 63:10-64:25)

Thus, there is more than sufficient evidence to conclude that defendants are reasonably likely to violate the securities laws unless enjoined. Although Svoboda and Robles obviously cannot resume their scheme involving inside information misappropriated from NationsBank, the broad scope of the scheme,

defendants' familiarity with securities trading, and the lengths

to which defendants went to conceal their activities all suggest

that defendants could again violate the securities laws if

presented with an opportunity.  Defendants' assurances that they

will not do so do not compel a different result. See <u>S.E.C.</u> v.

<u>Am. Bd. of Trade, Inc.</u>, 750 F. Supp. 100, 104 (S.D.N.Y. 1990)

("[W]here prior violations have been shown, a permanent

injunction may be appropriate even in the face of defendant's

disclaimer of an intent to violate the law in the future.").

Accordingly, defendants are permanently enjoined from

violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b),

and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; Section 14(e)

of the Exchange Act, 15 U.S.C. § 78n(e), and Rule 14e-3

thereunder, 17 C.F.R. § 240.14e-3; and Section 17(a) of the

Securities Act, 15 U.S.C. § 77q(a).


B. Disgorgement and Prejudgment Interest

The SEC next requests that Svoboda and Robles be

ordered to disgorge their ill-gotten gains and pay prejudgment

interest on these amounts.  The SEC seeks also to hold Svoboda

jointly and severally liable for Robles' disgorgement and

prejudgment interest.

Disgorgement is an equitable remedy that "seeks to

deprive the defendants of their ill-gotten gains to effectuate

the deterrence objectives of the securities laws," S.E.C. v. Wang, 944 F.2d 80, 85 (2d Cir. 1991), and "forc[e] a defendant to give up the amount by which he was unjustly enriched." S.E.C. v. Commonwealth Chem. Secs., 574 F.2d 90, 102 (2d Cir. 1978). "The effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable. The deterrent effect of an SEC enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits." First Jersey, 101 F.3d at 1474 (citation and internal quotation marks omitted).

A district court has "broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." First Jersey, 101 F.3d at 1474-75. The disgorgement amount need be only "a reasonable approximation of profits causally connected to the violation" and any risk of uncertainty in calculating the amount "should fall on the wrongdoer whose illegal conduct created that uncertainty." S.E.C. v. Patel, 61 F.3d 137, 139, 140 (2d Cir. 1995) (internal quotation marks omitted). Once the SEC has demonstrated that the disgorgement amount is a reasonable approximation, "the burden shifts to the defendant to demonstrat[e] that he received less than the full amount allegedly misappropriated and sought to be disgorged." S.E.C. v. Save the World Air, Inc., No. 01 Civ. 11586 (GBD)(FM), 2005 WL 3077514, at *17 (S.D.N.Y. Nov. 15,

2005); see also S.E.C. v. Hasho, 784 F. Supp. 1059, 1111 (S.D.N.Y. 1992).  An order of disgorgement is appropriate at the summary judgment stage.  See, e.g., Freeman, 290 F. Supp. 2d at 407-08; Roor, 2004 WL 1933578, at *11; Sekhri, 2002 WL 31100823, at *16-*17.

Disgorgement is warranted here to ensure that Svoboda and Robles are not unjustly enriched by their illegal trading. The SEC has submitted evidence demonstrating that Svoboda and Robles' ill-gotten gains total over $1.25 million (see Rubenstein Decl. ¶ 18) -- far more than the $500,000 in criminal penalties assessed by Judge Berman at defendants' sentencings. (See Rubenstein Decl., Exs. G, I)  Thus, to this day, both defendants retain much if not most of their illegal profits.  Such a result undermines the SEC's effective enforcement of the securities laws.  First Jersey, 101 F.3d at 1474.[4]

As for the amount of disgorgement, I find that the profit totals submitted by the SEC based on each defendant's

_____

[4]    Contrary to Svoboda's misleading assertion that the criminal fines imposed by Judge Berman constituted a "disgorgement order" (see Svoboda Opp. Mem. at 4), Judge Berman stated at each defendant's sentencing that his fine was not restitution and that he was not imposing restitution precisely because of the SEC's complaint in the present action.  (See Rubenstein Decl., Ex. G, 18:6-8; id., Ex. I, 72:6, 74:5-13).  It is well-established that the imposition of criminal penalties does not preclude disgorgement, which "is designed in part to ensure that the defendant not profit from his illegal acts, a goal that is nonpunitive."  S.E.C. v. Palmisano, 135 F.3d 860, 866 (2d Cir. 1998).

brokerage account statements –- $219,100 for Svoboda and

$1,039,252.80 for Robles (see Rubenstein Decl. ¶¶ 13, 15) –-

constitute "a reasonable approximation of profits causally

connected" to defendants' fraudulent trading.  Patel, 61 F.3d at

139.  Because the SEC's disgorgement calculation is "reasonable,"

the burden shifts to Svoboda and Robles to demonstrate that they

received less than the full amount sought to be disgorged.

Neither Svoboda nor Robles disputes the SEC's arithmetic.  Robles

nonetheless challenges the SEC's disgorgement amount –- and seeks

to avoid summary judgment on disgorgement –- by arguing that the

disgorgement total should take into account (1) losses incurred

on trades that were part of his criminal indictment but not

included in the SEC's amended complaint; (2) unspecified costs

incurred in connection with the trades; and (3) taxes paid on

trading gains.  (See Robles Opp. Mem. at 3-5)

         I cannot agree.  The disgorgement amount should be

based only on the illegal trades that are charged in the SEC's

complaint and that provide the basis for Robles' civil liability.

Including losses incurred on uncharged trades for which Robles

has not been found civilly liable would be just as improper as

compelling Robles to disgorge gains from uncharged conduct,

something Robles surely would object to.  As for the "ordinary"

expenses incurred in connection with the trades (see Abercrombie

Decl. ¶ 8; Robles Opp. Mem. at 3, 4), Robles has failed to

23

identify what these expenses are or to offer any evidence of
their amount.  Although some courts have recognized that
brokerage commissions and other related transaction costs may be
deducted from a defendant's disgorgement total, see, e.g., S.E.C.
v. Shah, No. 92 Civ. 1952 (RPP), 1993 WL 288285, at *5 (S.D.N.Y.
July 28, 1993), general business expenses may not be deducted.
See S.E.C. v. Credit Bancorp, Ltd., No. 99 Civ. 11395 (RWS), 2002
WL 31422602, at *3 (S.D.N.Y. Oct. 29, 2002); S.E.C. v. Rosenfeld,
No. 97 Civ. 1467 (WHP)(RLE), 2001 WL 118612, at *2 (S.D.N.Y. Jan.
9, 2001); S.E.C. v. World Gambling Corp., 555 F. Supp. 930, 934-
35 (S.D.N.Y.), aff'd, 742 F.2d 1440 (2d Cir. 1983).  Because
Robles bears the burden of resolving the risk of uncertainty in
calculating disgorgement, see Patel, 61 F.3d at 140, and could
easily have specified the amount of any commissions paid, I will
not find a disputed issue of material fact on the basis of his
vague and unsubstantiated allegation that he incurred "expenses."
Finally, Robles has failed to identify any legal authority
supporting the deduction of capital gains taxes from illicit
trading gains.  Moreover, even if I were to find such a deduction
appropriate, which I do not, Robles has failed to specify the
amount of additional taxes paid due to the illegal trades or the
potential effect of a disgorgement order on his future tax
liability.  See World Gambling, 555 F. Supp. at 935.  For the
reasons set forth above, it appears that the SEC's $1,039,252.80

sum is "a reasonable approximation," <u>Patel</u>, 61 F.3d at 139, of
Robles' profits from defendants' scheme.

In addition to disgorgement, the SEC is entitled also
to prejudgment interest on both Svoboda's and Robles' illegal
gains. "Requiring payment of interest prevents a defendant from
obtaining the benefit of what amounts to an interest free loan
procured as a result of illegal activity." <u>S.E.C.</u> v. <u>Moran</u>, 944
F. Supp. 286, 295 (S.D.N.Y. 1996). A district court has broad
discretion to decide whether to assess prejudgment interest and
the rate used in calculating such interest. <u>First Jersey</u>, 101
F.3d at 1476. In determining whether prejudgment interest is
warranted, a court should consider "(i) the need to fully
compensate the wronged party for actual damages suffered, (ii)
considerations of fairness and the relative equities of the
award, (iii) the remedial purpose of the statute involved, and/or
(iv) such other general principles as are deemed relevant by the
court." <u>Id.</u> (internal quotation marks omitted).

"In an enforcement action brought by a regulatory
agency, the remedial purpose of the statute takes on special
importance." <u>Id.</u> Accordingly, courts routinely have awarded
prejudgment interest in SEC enforcement actions where the
defendant's scheme evidences a high degree of bad intent. <u>See</u>,
e.g., <u>S.E.C.</u> v. <u>Musella</u>, 748 F. Supp. 1028, 1042-43 (S.D.N.Y.
1989); <u>Freeman</u>, 290 F. Supp. 2d at 407-08; <u>Milan Capital</u>, 2000 WL

1682761, at *10; <u>Sekhri</u>, 2002 WL 31100823, at *18; <u>Shah</u>, 1993 WL 288285, at *6. Svoboda and Robles' insider trading scheme, which extended almost four years, implicated over 20 issuers, and involved numerous forms of deceptive conduct, fits well within these precedents.

The Second Circuit has endorsed the use of the IRS underpayment rate in actions brought by the SEC. <u>See</u> <u>First Jersey</u>, 101 F.3d at 1476. "That rate reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant[s] derived from [their] fraud." <u>Id.</u> The SEC has applied the IRS underpayment rate to Svoboda and Robles' gains using a computer program and arrived at totals of $186,911.11 for Svoboda and $757,821.53 for Robles. (<u>See</u> Rubenstein Decl. ¶¶ 16-18, Exs. L, M) Neither defendant challenges these calculations. However, Robles argues that prejudgment interest should not be awarded because the SEC allegedly delayed pursuing its complaint for over four years. (<u>See</u> Robles Opp. Mem. at 10) This argument has no merit as "defendants plainly had the use of their unlawful profits for the entire period." <u>First Jersey</u>, 101 F.3d at 1477; <u>see</u> <u>also</u> <u>Warde</u>, 151 F.3d at 50. The court therefore assesses prejudgment interest at the rates calculated by the SEC: $186,911.11 for Svoboda and $757,821.53 for Robles.

Finally, Svoboda shall be jointly and severally liable

for Robles' disgorgement and prejudgment interest amounts.  The
undisputed facts demonstrate that Svoboda and Robles were full
partners in the scheme to misappropriate NationsBank's
confidential information and that they agreed to split evenly all
profits earned from illegal trading.  (Pl.'s Statement of Facts ¶
16)  Svoboda testified that Robles kept a ledger listing
Svoboda's share of the illicit gains (Rubenstein Decl., Ex. F,
710:1-11), furnished him with $30,000-40,000 in cash payments
representing a portion of these gains (id. at 702:14-15), and
made several thousands of dollars of credit card purchases on his
behalf (id. at 703:18-706:25).  Because Svoboda was to share
equally in the proceeds of the fraudulent scheme that he enabled,
it is appropriate to hold him jointly and severally liable for
the profits that the scheme generated.  See First Jersey, 101
F.3d at 1475-76; Sekhri, 2002 WL 31100823, at *17; S.E.C. v.
Breed, No. 01 Civ. 7798 (CSH)(AJP), 2004 WL 909170, at *5-*6
(S.D.N.Y. Apr. 29, 2004); see also Warde, 151 F.3d at 49 ("A
tippee's gains are attributable to the tipper, regardless of
whether benefit accrues to the tipper.  The value of the rule in
preventing misuse of inside information would be virtually
nullified if those in possession of such information, although
prohibited from trading for their own accounts, were free to use
the inside information on trades to benefit their families,
friends, and business associates.").  Svoboda therefore is

jointly and severally liable for Robles' $1,039.252.80 in
disgorgement and $757,821.53 of prejudgment interest.

## C. Civil Penalties under ITSFEA

The SEC asks that this court impose the maximum civil
penalties permissible under Section 21A of the Insider Trading
and Securities Fraud Enforcement Act (ITSFEA), 15 U.S.C. § 78u-1,
on both defendants.  Section 21A provides that the civil fine for
insider trading "shall be determined by the court in light of the
facts and circumstances, but shall not exceed three times the
profit gained or loss avoided" as a result of a defendant's
illegal trading.  Id. §§ 78u-1(a)(1), (a)(2).  The SEC requests
that I impose a civil penalty on Svoboda totaling $3,624,683.40
($615,300 for Svoboda's individual trading and $3,009,383.40 for
Robles' trading) and on Robles totaling $3,009,383.40.[5]  (SEC
Mem. at 29-30)  Both defendants object to the imposition of any
civil penalties.

What became the ITSFEA's civil penalty provision was
originally established by prior legislation in order to "go
beyond disgorgement of illegal profits to add the imposition of a
significant fine as a needed deterrent." H.R. Rep. No. 100-921,

---

[5]     The SEC has decided not to seek civil penalties for any
claims that were not included in its original complaint.  (SEC
Mem. at 29 n.7) Hence, the penalties sought are slightly less
than three times the amount sought in disgorgement.

at 11 (1988), 1988 U.S.C.C.A.N. 6043, 6048.  Although the statute
does not indicate what "facts and circumstances" a district court
is to take into account in determining the appropriate penalty,
courts generally consider "the defendant's culpability, the
amount of profits gained, the repetitive nature of the unlawful
act and the deterrent effect of a penalty given the defendant's
net worth." _Sekhri_, 2002 WL 31100823, at *18; _see_ _also_ _Freeman_,
290 F. Supp. 2d at 407.  Some courts have weighed other factors
also such as whether the defendant is employed in the securities
industry, _see_, _e.g._, _S.E.C._ v. _Falbo_, 14 F. Supp. 2d 508, 528-29
(S.D.N.Y. 1998); whether the defendant has a prior record of
securities violations, _see_ _id._ at 528-29; and other penalties
that arise out of defendants' conduct, _see_ _Shah_, 1993 WL 288285,
at *6; _S.E.C._ v. _Yun_, 148 F. Supp. 2d 1287, 1295 (M.D. Fla.
2001).  Courts in this district have not hesitated to impose
penalties where the defendants executed multiple insider trades
and their scheme evidenced a high degree of intent.  _See_, _e.g._,
_Sekhri_, 2002 WL 31100823, at *18-*19 (imposing maximum penalties
where defendants' insider trading was "repetitive in nature,
occurring on numerous occasions, and involved five major
corporate transactions" and defendants had fled to avoid
prosecution); _Freeman_, 290 F. Supp. 2d at 406, 407 (imposing
penalty equal to illicit gain amount where defendant's trading
"occurred in a continuous and systematic pattern spanning over

29

two years"); <u>Falbo</u>, 14 F. Supp. 2d at 528-29 (imposing $50,000 penalty on insider trader who concealed trades using others' accounts, tipped others, and encouraged their trading).

The facts and circumstances surrounding Svoboda and Robles' insider trading scheme and subsequent prosecution demand some form of civil penalty. Like the defendants in <u>Sekhri</u>, <u>Freeman</u>, and <u>Falbo</u>, Svoboda and Robles perpetrated a fraud involving repeated securities law violations, considerable profits, and a high degree of scienter. In fact, defendants' scheme persisted far longer and involved considerably more trading than the schemes that prompted civil penalties in any of these cases. <u>See</u> <u>Sekhri</u>, 2002 WL 31100823, at *1 (defendants' scheme lasted five months and involved five issuers); <u>Freeman</u>, 290 F. Supp. 2d at 405 (defendant used inside information on eight occasions over two-year span); <u>Falbo</u>, 14 F. Supp. 2d at 516-17 (defendant used information to make four purchases and sold stock for profit within six months).

Nonetheless, imposing the maximum penalties, which would total over $3 million for each defendant, would be inappropriate given each defendant's financial situation, especially considering the other sums already assessed by this opinion and by Judge Berman. Although Svoboda's net worth is difficult to pin down, he represents that his sole remaining asset is an IRA worth $690,000. (<u>see</u> Svoboda Opp. Mem. at 3 n.1)

30

In addition, Svoboda has filed a Chapter 13 bankruptcy action
that allegedly understates his indebtedness to the SEC and
appears to have attempted to secure a payment waiver from the SEC
for his civil liability. (Schrage Reply Decl. ¶¶ 1-2, Ex. B).
I view Svoboda's submissions with skepticism and am deeply
troubled by the SEC's allegations of "bad faith" behavior in
Svoboda's Chapter 13 action. That said, Svoboda cannot endure an
additional $3,624,683.40 in penalties on top of the $2.2 million
in liability imposed in this opinion and the $200,000 criminal
fine imposed by Judge Berman in 2002. Robles, meanwhile, has
submitted a May 2004 financial statement asserting that his net
worth as only $45,450. (Abercrombie Decl. ¶ 10, Ex. 2) I have
serious concerns about the reliability and completeness of this
submission and, like the SEC, question what happened to the
$1,039,252.80 produced by defendants' scheme. Nonetheless,
imposing $3,009,383.40 in additional civil penalties on top of
the $2.2 million already imposed by this opinion and the $300,000
fine assessed by Judge Berman goes too far. Both defendants
should be assessed less than the maximum penalty in light of
their financial condition.[6] See Yun, 148 F. Supp. 2d at 1295,

---

[6] In arriving at the conclusion that the maximum
penalties are not warranted, the court also notes that both
defendants are first-time offenders, see Falbo, 14 F. Supp. 2d at
528-29, and that both have served or are serving prison sentences
in connection with their illegal conduct, see Shah, 1993 WL
288285, at *2, *6.

1297-98 (imposing civil penalty of $100,000 despite SEC request for $807,000 penalty and defendant's "significant levels of misconduct" because defendant's net worth was only $264,282); S.E.C. v. Pardue, 367 F. Supp. 2d 773, 777-78 (E.D. Pa. 2005) (imposing civil penalty of $25,000 despite SEC's request for $136,697 fine and defendant's "very serious" securities law violations due to defendant's negative net worth); Shah, 1993 WL 288285, at *6 (declining to impose any civil penalty due to other penalties imposed); cf. S.E.C. v. Lipson, 129 F. Supp. 2d 1148, 1159 (N.D. Ill. 2001), aff'd, 278 F.3d 656 (7th Cir. 2002) (imposing maximum penalty of $1,865,625, but noting CEO's net worth of over $100 million); S.E.C. v. Ferrero, No. IP 91 271 C, 1993 WL 625964, at *19 (S.D. Ind. Nov. 15, 1993), aff'd sub nom, S.E.C. v. Maio, 51 F.3d 623 (7th Cir. 1995) (imposing maximum penalty of $838,875, but noting defendant's testimony that $500,000 was "a very small part of his total net worth").

Moreover, Svoboda deserves a lesser penalty than Robles. Although defendants engaged in equally culpable conduct, their behavior since this conduct was uncovered suggests differing needs for further deterrence. Svoboda pleaded guilty to the criminal charges against him (after initial resistance) and then provided "substantial assistance" to the government at Robles' criminal trial, offering testimony that Judge Berman characterized as "very helpful and instrumental" in obtaining

Robles' conviction. (Rubenstein Decl., Ex. G, 14:6-7, 32:13).

Robles, by contrast, did not accept responsibility for his

conduct until recently and gave testimony at his criminal trial

that Judge Berman characterized as "not credible," and sometimes

"intentionally false." (Rubenstein Decl., Ex. I, at 63-64) In

addition, he has still failed to adequately account for the

scheme's proceeds -- the vast majority of which he retained -- in

his submissions on this motion. These facts warrant a higher

civil penalty for Robles.

     I therefore impose on Svoboda and Robles penalties of

$150,000 and $250,000, respectively. Although these penalties

are considerably less than those requested by the SEC, they

represent a severe reprimand given each defendant's financial

condition and will adequately deter future criminal conduct.

*   *   *

     For the reasons set forth above, I grant plaintiff

summary judgment on its claims brought under Section 10(b) of the

Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. §

240.10b-5; Section 14(e) of the Exchange Act, 15 U.S.C. § 78n(e),

and Rule 14e-3 thereunder, 17 C.F.R. § 240.14e-3; and Section

17(a) of the Securities Act, 15 U.S.C. § 77q(a). I also

permanently enjoin both defendants from violating these statutes

and regulations and assess the following additional relief: (1)

disgorgement totaling $219,100.00 for Svoboda and $1,258,352.80

for Robles; (2) prejudgment interest totaling $186,911.11 for Svoboda and $757,821.53 for Robles; and (3) civil penalties totaling $150,000 for Svoboda and $250,000 for Robles. Svoboda shall be jointly and severally liable for Robles' disgorgement and prejudgment interest, but not his civil penalty.

Settle judgment on 10 days notice.

SO ORDERED:

Dated: New York, New York
January 3, 2006

Michael B. Mukasey,
U.S. District Judge